**E-FILED**

Thursday, 17 July, 2008  04:41:12 PM

Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JULIE STEPHENS LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | NO. 06-3194 |
| TEACHERS' RETIREMENT | ) | |
| SYSTEM OF THE STATE OF | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

The Teachers' Retirement System of the State of Illinois ("TRS")

moves for summary judgment on Plaintiff Julie Stephens Long's ("Long")

claim under the Family Medical Leave Act's ("FMLA") anti-retaliation

provision.[1]

Summary judgment is granted to TRS.

---

[1]TRS also filed a motion to strike, which is granted in part and
denied in part.

## I.  Motion to Strike

Before laying out the material facts, the Court must determine what assertions belong in the record.  TRS claims that Long's affidavit conflicts with her prior deposition testimony on a number of points and moves to strike it, in whole or in part.  Long objects.

An affidavit, even a self-serving one, may suffice to defeat a summary judgment motion if it is supported by the record or "based on personal knowledge" and "set[s] forth specific facts" demonstrating that a genuine issue of material fact exists.  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (citing *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).  Nevertheless, a party "cannot create 'sham' issues of fact with affidavits that contradict their prior depositions."  *Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005)) (internal quotations omitted).  "If such contradictions were permitted . . . the very purpose of the summary judgment motion - to weed out unfounded claims, specious denials, and sham defenses - would be severely undercut."  *Ineichen*, 410 F.3d at 963

2

(quoting *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996)) (internal quotations omitted).

TRS urges the Court to strike Long's affidavit for specifically denying certain facts that Long could not recall during her deposition.  In response, Long suggests that a memory lapse and a later denial are not inimical.  Regardless of whether two statements absolutely conflict, striking remains the proper remedy if "'the affidavit differs from prior deposition testimony to the point that it is unreliable.'"  *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 736 (7th Cir. 2001) (quoting *Patterson v. Chi. Ass'n for Retarded Citizens*, 150 F.3d 719, 720 (7th Cir. 1998)).

Having assiduously reviewed this record, the Court concludes that several conflicts exist between the affidavit and the deposition.  First, Long avers that she never received any complaints or counseling concerning her work, an assertion that starkly contrasts with her deposition testimony about losing a promotion because of excessive absenteeism.  *See id.* at 737 (finding no abuse of discretion in district court's striking of statement in affidavit that plaintiff "'was never informed . . . that [her] job performance

3

was lacking or needed improvement'" where plaintiff's deposition testimony stated that she had once been confronted about stealing customers).

Second, Long claims in her affidavit that a variety of meetings did not occur, including two in September of 2005.  At her deposition, however, Long admitted that she did not recall any such meetings.  She elaborated on this point when discussing a September meeting, explaining, "I really don't know.  I can't honestly say yes or no because I don't remember."  No explanation is given for her sudden recollection.  Therefore, these paragraphs are stricken.[2]

Third, Long asserts that a majority of her absences were FMLA-related and sets out specific days she now believes were covered by FMLA leave.  Some of these dates are consistent with her affidavit testimony, but others directly conflict with it.  A particularly egregious example of the latter is Long's affidavit claim that she missed work due to an ovarian cyst.  In her

---

[2]The Court declines to strike Long's statements relating to the January 2006 meeting.  Long's simple "no" to the question of whether she remembered such a meeting could be read as a denial of the meeting occurring or a lack of recall.  Since TRS did not seek clarification, the Court cannot find a clear conflict with the affidavit.

deposition, however, she testified that she was Christmas shopping.  No explanation is given for this discrepancy and no medical records or other evidence is offered to bolster Long's current claims.   Rather than dig through the record to verify or strike each FMLA assertion, this Court elects to strike the entire paragraph.[3]  *See Rogers v. City of Chi.*, 320 F.3d 748, 751 (7th Cir. 2003) (noting, in similar circumstances, that district courts have "no obligation to scour [an] affidavit in order to glean what little admissible evidence it may . . . contain").

Therefore, TRS' motion to strike is granted with respect to paragraphs 7, 18, 25, 26, and 28.  Beyond that, it is denied.[4]

## II.  FACTS

The Court now turns to the remaining record evidence, all of which is construed in Long's favor.  *Harney v. Speedway SuperAmerica, LLC*, 526

---

[3]In any event, it should be noted that Long's filings only assert a retaliation claim and not an interference claim.

[4]Since the inconsistencies are not pervasive, the Court declines TRS' invitation to strike the entire affidavit from the record.

F.3d 1099, 1104 (7th Cir. 2008).[5]

A.      **Structure of the Teachers' Retirement System**

The Teachers' Retirement System of the State of Illinois ("TRS") services some 300,000 active and retired Illinois public school personnel. Among its other duties, TRS provides over 82,000 retirees and other beneficiaries with monthly benefit payments.

TRS' day-to-day operations are managed by Executive Director Jon Bauman ("Bauman").  Bauman has the final say on all disciplinary actions, including suspension and termination.  Generally, however, personnel activities at TRS fall within the province of Human Resources Director Gina Larkin ("Larkin").  Larkin typically works with individual managers when making recommendations on disciplinary actions.

Long was employed by TRS' Payroll and Insurance Department ("Payroll"), which shoulders responsibility for processing direct deposit forms for members.  At all relevant times, Manager Marshall Branham

---

[5]The parties quibble over nearly every "undisputed fact." Nevertheless, many of these arguments are baseless and so the facts are included despite objections.

6

("Branham") was responsible for this department and oversaw four Payroll employees, including Susan Ward ("Ward") and Long.

## B.    Processing of EFTs

Among the functions overseen by Branham was the processing of electronic fund transfers ("EFTs").  Through use of EFTs, TRS could deposit monthly benefit payments directly into a member's bank account, thereby expediting the delivery of funds.  Responsibility for enrolling annuitants in the EFTs system and updating annuitant information was vested in Long.  Her job included responding to address change communications, entering EFT information, and verifying bank routing and account numbers.  Thus, when a new EFT came in, or a member sent in a notice of a change (e.g., a new routing number), Long would enter the data into TRS' computer system.

In order to minimize the risk of error, EFT entries are subjected to multiple layers of review.  The first level involves a verification process, in which a second employee cross-checks the information inputted by the first employee.  A second level involves the "prenote" process, wherein all of the

EFT changes are forwarded to the Office of the Comptroller for accuracy testing.  This information was transmitted on the first business day of the month, which TRS employees refer to as the "prenote cutoff" or "prenote deadline."

Assuming the EFT information was confirmed as accurate by the Comptroller, the EFT disbursements would begin later that month. Generally, the transfers would occur around the 20th of each month.  TRS employees referred to this date as the "payroll date cut-off."

## C.    Long's Employment with TRS

Long began working at TRS in 1985.  In 2000, she was promoted to her Payroll job and given responsibility for the EFT enrollment functions. No other employee held a similar position.  During the early years of Long's tenure in Payroll, assessments of her work were quite favorable.

Over time, however, these high ratings eroded.  By the summer of 2005, Long's truancy had become a serious problem.  In June 2005, she missed twenty-five percent of the working days; in July, that percentage soared up to forty percent.  Nothing suggests that these  absences were

8

FMLA-related. On July 26, 2005, Branham informed Long that he would withdraw his recommendation for her promotion because of excessive absenteeism. Long concurred with his assessment.

Nevertheless, the absenteeism continued intermittently as new problems emerged. In September 2005, several EFT errors were traced back to Long. On September 8, Long improperly recorded a member's bank, resulting in a check being sent to the wrong location. On September 14, Long failed to properly document an address, resulting in information being sent to a member's estranged ex-wife. Branham and Ward met with Long on September 15, 2002, to discuss these problems and Long's absenteeism, which put the burden of correcting Long's errors on other staff members. During the meeting, Branham also warned Long that she had not timely processed several payroll deduction plan applications. As a result of Long's difficulties, the job of processing payroll deduction plan forms was moved to the Optional Services Department. Finally, Branham urged Long to train other staff on EFT functions. The meeting was summarized in a September 20, 2005, writing.

In addition to these problems, TRS employees also began complaining of angry phone calls from members relating to Long's EFT work.  Though Long was responsible for addressing such complaints, the burden often fell on other employees because of Long's absences.  Further, Long was accused of failing to answer her phone or return calls even while at work.   On September 27, 2005, Branham met with Long to discuss this problem.

On September 26, 2005, Sally Sherman ("Sherman"), Branham's immediate supervisor, suggested that Long might be eligible for FMLA.  Following up on this suggestion, Long obtained a medical certification form regarding her medial epicondylitis.   TRS approved the FMLA leave in October and instructed Long to notify her supervisors when she was absent because of that medical condition.   TRS received information that Long's September 22 and 28, 2008, absences were related to medial epicondylitis.  On November 28, 2005, Long obtained a second medical form certifying that she suffered from an ovarian cyst.   TRS approved FMLA-related leave pursuant to this certification on December 2, 2005.

Long was admonished to inform her supervisors when her absences

10

were FMLA related.  She informed TRS that the following absences were FMLA related: October 13, 14, 20, 21, 24, and 28; November 3, 7, 8, 9, 10, 14, 15, and 18, 2005; and January 5, 2006.  However, Long repeatedly failed to contact her supervisors when reporting absences.  During a meeting occurring around December 5, 2005, Branham provided Long with a memo instructing her to contact certain individuals in the event of an absence.  Nevertheless, Long admits that she reported her absences to co-workers if the listed individuals were not immediately available.

Nor were reporting failures Long's only difficulty in late 2005 and early 2006.  Again, Long was often absent for non-FMLA reasons, including nine days in December, five in January, and the first two days of February.[6]  This placed the burden of responding to any complaints on Ward.

Finally, Branham also claims that a new set of problems arose regarding data entry.  As discussed above, any EFT information entered into the system was verified before being forwarded to the Comptroller's Office.  To expedite this process, EFT slips were to be physically delivered

---

[6]As discussed below, Long was terminated on February 3, 2006.

11

to Data Services on a daily basis, so that verification could begin immediately.  On multiple occasions, however, Long would wait until the day before the pre-note cutoff to bring the slips to Data Services, forcing them to handle all the slips in a single day.  In her defense, Long claims that Branham never relayed the delivery instructions to her.[7]

### D.   Termination

During the Fall of 2005, Larkin learned of various complaints about Long's work.  She met with Branham and Sherman and told them to document further performance issues and discuss any problems with Long. In November 2005, Larkin received more reports of difficulties, as well as several emails alleging various errors on Long's part.  In late December 2005 or early January 2006, Larkin met with Branham and Sherman, who believed that Long's performance issues were not improving and that TRS was failing to get its checks to its members.

After discovering a large backlog of EFT forms on several occasions in

---

[7]Branham suggests that such instructions were given to Long on multiple occasions.

12

late 2005 and early 2006, Branham suggested that Long be terminated.  At this point, Larkin reviewed Long's performance, the member complaints related to her work, and the comments from Branham and Sherman.  She also consulted with counsel.

During her January 2006 review, Larkin met with Bauman twice to discuss Long.  On January 31, 2006, Larkin recommended that Bauman terminate Long.  After reviewing Larkin's information on Long's performance deficiencies and discussing several member complaints with Branham, Bauman concurred.  Although he reviewed Long's record, Bauman claims he lacked any knowledge of Long's FMLA leave.

On February 3, 2006, Long was terminated.  On August 31, 2006, Long filed suit against TRS alleging FMLA retaliation.  TRS moved for summary judgment and subsequently filed a motion to strike Long's affidavit.  Both motions were fully briefed.

### III.  ANALYSIS

### A.    Summary Judgment Standards

"Summary judgment is proper 'if the pleadings, the discovery and

13

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1032 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## B.    Family Medical Leave Act Retaliation Claims

The Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, grants eligible employees certain substantive rights, including twelve weeks of leave for a "serious health condition," 29 U.S.C. § 2612.  If an employer interferes with these rights, an employee may bring suit under § 2615(a)(1). To prevail on such claims, the employee need not show discriminatory intent, but only an entitlement to the right.  *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).  The FMLA also prohibits discrimination based on an employee's invocation of FMLA rights.  § 2615(a)(2).  These claims, however, require a showing of discriminatory

14

intent.  *King*, 166 F.3d at 891.

Long asserts wrongful termination, a claim that can be brought under "either a discrimination/retaliation or an interference/entitlement theory." *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005).  In this case, Long's arguments suggest a discrimination/retaliation theory: that she was fired for using FMLA leave.  As such, the Court, following the parties' lead, will analyze the case under § 2615(a)(2).

Section 2615(a)(2) of the FMLA prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by [the FMLA]."  29 U.S.C. § 2615(a)(2).  Such discrimination occurs when employers "use the taking of FMLA leave as a negative factor in employment actions . . . ."  29 C.F.R. § 825.220(c).  In analyzing FMLA retaliation claims, the courts rely on the framework established in other employment statutes, such as Title VII of the Civil Rights Act of 1964.  *Buie*, 366 F.3d at 503.  Thus, a plaintiff can establish retaliation through direct or indirect methods.  *Id.*

Long pursues her claim under the direct method.  To establish a prima

15

facie case of retaliation under the direct method, the plaintiff may rely on direct or circumstantial evidence or both. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). Circumstantial evidence, upon which Long primarily relies, allows a jury to infer intentional discrimination by the decision-maker. *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008) (citing *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005)). Circumstantial evidence includes "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Long raises three pieces of circumstantial evidence in support of her claims: (1) Branham's statements, (2) TRS' failure to follow internal policies, and (3) Long's employment history.[8]

---

[8]For the sake of convenience, each piece of evidence will be analyzed separately. In determining whether the evidence sufficiently raises the inference of discrimination, however, the Court considers the cumulative effect of all the evidence. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 170 (1st Cir. 1998).

TRS argues that this information is insufficient to support an inference of retaliation.

### 1.    Circumstantial Evidence: Branham's Statements

Branham, who first suggested that Long be fired, expressed frustration with Long's absenteeism in a memo, an email, and at his deposition.  Long asserts that retaliatory intent can be gleaned from these statements.  TRS, however, responds by arguing that (1) no evidence of discriminatory intent existed because Branham's statements referred only to Long's non-FMLA absences and (2) Branham was not the decision-maker, so any retaliatory intent he had cannot be imputed to Bauman.

### a.    Reference to Absences Support Inference of Retaliatory Intent

The first question is whether a jury could infer discriminatory or retaliatory intent from Branham's statements concerning Long's absences. Long highlights several of Branham's comments in support of her argument. First, Branham stated in a memo that he had met with Long to discuss her absences and their concomitant impact on Payroll's work load.  In his deposition, Branham admitted that absenteeism was a big problem for Long

17

from June 2005 through January 2006.  He attributed problems such as EFT backlogs and missed member calls to these absences.  He also stated that Long's absences created morale problems for other employees.

TRS argues that the statements fail to show a retaliatory intent, because Branham was referring only to Long's non-FMLA absences.  The statements themselves, however, fail to distinguish between FMLA and non-FMLA leave, making them ambiguous.  Such ambiguity must be read in Long's favor.  *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990) ("[T]he task of disambiguating ambiguous utterances is for trial, not for summary judgment.").  So construed, the statements support the inference that Branham harbored a retaliatory intent.  *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 170-72 (1st Cir. 1998) (noting that an employer's repeated references to excessive absenteeism before terminating a employee returning from FMLA leave ordinarily creates an issue for trial).

### b.  Imputation of Branham's Animus (Cat's Paw Analysis)

Since Branham's ambiguous statements could constitute evidence of retaliatory intent, the Court asks whether they were causally connected to

18

Long's termination.  A plaintiff proceeding under the direct method must provide evidence showing that a decision-maker, rather than a supervisor, harbored a discriminatory intent.  *Rogers*, 320 F.3d at 754.  "A decisionmaker is the person 'responsible for the contested decision.'"  *Id.* (quoting *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)).  In this case, Bauman ultimately decided to fire Long, not Branham.

Nevertheless, "in certain circumstances a non-decisionmaker can exert influence of such a degree as to make his employer liable for his actions." *Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008).  For this to occur, "[t]he nominal decision-maker must be nothing more than the functional decision-maker's 'cat's paw.'" *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 917-18 (7th Cir. 2007) (citing *Shager*, 913 F.2d at 403).  For example, a supervisor or other non-decisionmaker may influence a decisionmaker by supplying false information or by concealing favorable information.  *Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 711 (7th Cir. 2005); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir.

19

1997) (citations omitted).

In this case, Branham provided factual input on Long's performance and made the initial recommendation that Long be terminated. "[S]ummary judgment is generally improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d 673, 684 (7th Cir. 2001) (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 752 n.1 (7th Cir. 1998)).  For example, in *Shager v. Upjohn Co.*, the appellate court reversed a grant of summary judgment in favor of the employer where the employee presented evidence that his immediate supervisor, who recommend his termination, may have set him up for failure through difficult work assignments and performance reviews tainted by age discrimination.  913 F.2d at 405.  In this case, Long appears to assert that Branham fed false information to Bauman or otherwise set her up for failure by not giving her EFT delivery instructions.

Nevertheless, ascribing Branham's alleged retaliatory animus to

Bauman (and, by extension, to TRS) would be improper in this case.  An employee only exerts sufficient influence "where the party nominally responsible for a decision is, by virtue of [his] role in the company, totally dependent on another employee to supply the information on which to base that decision."  *Brewer*, 479 F.3d at 918.  However, "'where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision maker.'"  *Metzger*, 519 F.3d at 682 (citing *Brewer*, 479 F.3d at 918).  Bauman did not act solely on Branham's recommendation, but also solicited input from Larkin, who conducted a full review of Long's performance and the member complaints.  As such, this Court cannot conclude that Branham's recommendation was merely "rubber stamped."[9]  Therefore, attributing Branham's motives, as gleaned

---

[9]Further, no evidence suggests that Bauman actually relied on the allegedly false information (i.e., that Long received instruction to deliver the EFTs on a daily basis but failed to comply with those directives). Indeed, in cataloguing his reasons for terminating Long, Bauman never mentioned anything about daily EFT deliveries, instead focusing on

(continued...)

21

from his ambiguous statements, to Bauman (or Larkin) would be improper.

## 2.    Other Circumstantial Evidence

In addition to Branham's statements, Long relies on two other pieces of circumstantial evidence.  First, Long argues that TRS failed to follow their employment policies by not giving her a written warning.[10]  The failure to follow with internal disciplinary procedures may support an inference of discrimination.  *See Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992).  The Employee Discipline Policy, however, also allows for management to begin discipline at any step.

Second, Long argues that an inference of discrimination may be drawn from the conflict between her prior favorable work history and her sudden performance decline.  *See Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("[A]n employer's sudden dissatisfaction with an

---

[9](...continued)
member complaints and misdirected checks.

[10]She also argues that she never received counseling, but the record does not support this assertion.  Branham and Sherman testified that counseling occurred during the September 2005 meetings.  Long testified she cannot recall these meetings.

employee's performance after that employee engaged in protected activity may constitute circumstantial evidence of causation."). Here, however, the inference is destroyed by timing, as Long's performance deficiencies began in June 2005, some two months prior to any FMLA leave. *Cf. Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419-420 (7th Cir. 2004) (drawing inference of EEOC retaliation where negative reviews immediately followed grievance that lead to EEOC charge). Further, the decline was hardly "sudden," as Long was warned about performance problems (including, in part, non-FMLA absenteeism) in June and September 2005 meetings. Therefore, any inference of retaliation based solely on Long's prior favorable work record is severely attenuated and insufficient to stave off summary judgment.

## IV.  CONCLUSION

<u>Ergo</u>, TRS' motion for summary judgment is GRANTED. The motion to strike is GRANTED in part and DENIED in part. This case is closed.

IT IS SO ORDERED.

23

ENTER:    July 17, 2008

FOR THE COURT:                          /s Richard Mills
                                        United States District Judge